# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| PAMELA WATERS, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. N21C-05-130 MAA |
| | ) | |
| v. | ) | |
| | ) | |
| DELAWARE MOVING AND | ) | |
| STORAGE, INC. and GIBELLINO | ) | |
| CONSTRUCTION CO., INC., | ) | |
| | ) | |
| Defendants. | ) | |

Submitted: April 13, 2023
Decided: June 28, 2023

***Upon Plaintiff Pamela Waters' Motion for Partial Summary Judgment*:
DENIED.**

***Upon Delaware Moving and Storage, Inc.'s Motion for
Partial Summary Judgment*:
GRANTED.**

***Upon Gibellino Construction Co., Inc.'s Motion for
Summary Judgment*:
GRANTED.**

## <u>OPINION</u>

Andres Gutierrez de Cos, Esquire, of ANDRES DE COS LLC, Wilmington, Delaware, Attorney for Plaintiff.

William A. Crawford, Esquire, of FRANKLIN & PROKOPIK, Newark, Delaware, Attorney for Defendant Delaware Moving and Storage, Inc.

Lisa M. Grubb, Esquire, of MARSHALL, DENNEHEY, WARNER, COLEMAN & GOGGIN, Wilmington, Delaware, Attorney for Defendant Gibellino Construction, Co. Inc.

**Adams, J.**

# I.  INTRODUCTION

Pending before the Court are Plaintiff Pamela Waters' ("Plaintiff") and Defendant-Subcontractor Delaware Moving and Storage's ("Subcontractor") cross-motions for partial summary judgment (collectively the "cross motions"); and Defendant Gibellino Construction's ("Contractor") motion for summary judgment.

The narrow issue presented in the cross motions is whether the "Replacement Cost Value" provision (the "Valuation Provision" or "Provision") in the Moving Contract between Plaintiff and Subcontractor, which purports to limit Plaintiff's recovery for damages to her property to $20,000, is valid and enforceable. Plaintiff claims that her actual damages are $53,757.[1] For the reasons that follow, Plaintiff's motion for partial summary judgment is DENIED and Defendant's motion for partial summary judgment is GRANTED.

Contractor moves for summary judgment on Plaintiff's breach of contract claim (Count III). There are two questions presented by Contractor's motion: (1) does the damage allegedly caused by Subcontractor constitute a breach of the Restoration Contract between Plaintiff and Contractor; and (2) does Contractor's alleged involvement in selecting the coverage amount in the Moving Contract constitute a breach of the Restoration Contract?  For the reasons that follow, the

---

[1] Compl. ¶ 60.

Court finds that the answers to these questions is no and Contractor's motion for summary judgment is GRANTED.

## II.    FACTS

### A. Background

Plaintiff is the owner of the property located at 303 Plymouth Rd., Wilmington, DE 19803.[2] On or about May 28, 2019, Plaintiff's home was damaged by a fallen tree.[3] Plaintiff hired Contractor to repair the damage to her home.[4] Plaintiff's property was covered by a homeowner's insurance policy issued by State Farm at the time the tree damaged her home.[5]  Contractor hired Subcontractor (collectively "Defendants") to remove Plaintiff's personal property and hold it in storage while Contractor was repairing the damage to her home.[6] The parties do not dispute that Contractor selected Subcontractor and referred Subcontractor to

---

[2] Compl. ¶ 1.
[3] Compl. ¶ 6.
[4] Compl. ¶ 8; *see infra* nn. 207-216 and accompanying text for a discussion of the contract between Plaintiff and Contractor.
[5] Compl. ¶ 7.
[6] *See* Dep. of Gabe Gibellino at 19:21-24 ("Gibellino Dep.").

Plaintiff.[7]  David Hopkins ("Hopkins"), co-owner of Subcontractor, testified that he considered Plaintiff as the customer and Contractor as "our account."[8]

Approximately one week prior to the date when Subcontractor packed and moved Plaintiff's property, James Sterling, an estimator for Subcontractor, came to Plaintiff's home to assess the number of boxes needed for packing Plaintiff's property.[9]  Sterling testified at his deposition that he did not assess the value of Plaintiff's property during that visit.[10]  Sterling included on this estimate a replacement cost valuation of $20,000, which was the customary valuation amount for all jobs where their customer hired Contractor.[11]  Sterling then emailed the

---

[7] Plaintiff alleges that she did not participate in hiring Subcontractor and that Contractor was solely responsible for hiring Subcontractor.  Aff. of Plaintiff ¶ 3 (Sept. 28, 2022) ("Pl. Aff.").  Gabe Gibellino ("Gibellino"), an estimator for Contractor, similarly testified that Plaintiff was not asked whether she would like to use a particularly moving company.  Gibellino Dep. at 20: 1-5.  David Hopkins ("Hopkins"), co-owner of Subcontractor, averred in his affidavit that Contractor referred Plaintiff to Subcontractor and that Subcontractor then sent its estimator (David Sterling) to assess the size of the move.  Affidavit of David Hopkins ¶ 8 (Aug. 26, 2022) ("Hopkins Aff.").

[8] Dep. of David Hopkins at 45:15-17 ("Hopkins Dep.").  James Sterling ("Sterling"), an estimator for Subcontractor, testified to his belief that both Contractor and Plaintiff are Subcontractor's customers.  Dep. of James Sterling at 8:13-19, 13:4-5 ("Sterling Dep.").

[9] Sterling Dep. at 6: 14-24; 7-11.

[10] Sterling Dep. at 48: 7-14.  David Hopkins ("Hopkins"), co-owner of Subcontractor similarly testified that Subcontractor does not conduct an estimate of the actual value of a customer's property before a coverage amount is selected.  Hopkins Dep. at 38:14-23.

[11] *See* Sterling Dep. at 18: 4-11; 19: 9-12 (A: "up until that time [before Plaintiff's move], for a Gibellino [Contractor] job, we never had more than $20,000" . . . Q: "So the amount varied, but with Gibellino [Contractor] it was always $20,000?" A: "Correct."); Hopkins Dep. at 39: 5-17 ("…we don't have a signed contract, but we have an agreement with Gibellino [Contractor] that we will . . . waive the minimal coverage, which is 60 cents a pound. We give them – we offer them $20,000.  And then if there is more that wants to be selected or that valuation is not sufficient, then the client, the customer, in this case Ms. Waters, has the ability to go further.  But we give a minimum of [$]20,000 instead of the minimum of 60 cents a pound."); *see also* Hopkins Dep. at 53:18-24; 54:1-2.

estimate for the move and storage to Contractor.[12] Sterling testified that the estimate, which included the selected valuation of $20,000, was not emailed to Plaintiff.[13] Gibellino testified that he typically only sends quotes from subcontractors to the customer's insurance carrier, not to the customer directly.[14]

On or about August 15, 2019, Subcontractor arrived at Plaintiff's home to move her personal belongings into storage.[15] After Subcontractor had loaded Plaintiff's personal belongings onto its truck, an employee for Subcontractor provided to Plaintiff a one-page document (the "Moving Contract" or the "Contract") for her signature that included valuation options for Plaintiff's property.[16] Sterling testified that, as a general matter, he tells customers this document is a contract and testified in the affirmative that the terms of the contract are negotiable.[17] Plaintiff averred in her Affidavit that, when she was handed the form, she assumed the document was a contract between Contractor and Subcontractor because "Gibellino's [Contractor] name was first on the paper."[18]

---

[12] Gibellino Dep. at 41: 13-16 (Q: "At some point the quote is e-mailed from Delaware Moving and Storage to Gibellino, correct?" A: "Correct."); Sterling Dep. at 8: 4-9 (Q: "and then once that estimate is ready you would e-mail it to Mr. Gibellino?" A: "Correct.").

[13] Sterling Dep. at 8:4-14.

[14] Gibellino Dep. at 17: 5-10; 23: 11-14.

[15] Compl. ¶ 11.

[16] Aff. ¶ 4.

[17] Sterling Dep. at 51: 11-20.

[18] Aff. ¶ 5. In the top left corner of the Moving Contract, next to the line for "Customer" is hand-written "Gibellino Construction – Pamela Waters."

Plaintiff alleges that before this date, she was not shown any documentation regarding the work that was to be performed by Subcontractor.[19]

## B. The Moving Contract

The top left corner of the body of the Contract contains the following title in all caps, bolded, and underlined: "**VALUATION OPTIONS**."[20] The Contract provides three options "to establish the appropriate valuation in the event of a loss and/or damage."[21] The Contract instructs the customer to "[p]lease read each of the three choices carefully, as this will determine the Replacement method of your household goods and property if damaged in Transit and while shipment is in storage."[22]

The three options are labeled "**A: NO CHARGE,**" "**B**: **IN-STORAGE VALUATION**," and "**C**: **Transit Rates – Replacement Cost Valuation**" ("Valuation Provision") with check boxes next to each.[23] Option A gives a customer the choice of selecting a replacement value of sixty cents per pound in the event their property is lost or destroyed.[24] Option A is not checked and "N/A" is written in the corresponding signature line.[25] For option B, next to "IN-STORAGE

---

[19] Aff. ¶ 4.
[20] Moving Contract.
[21] *Id.*
[22] *Id.*
[23] *Id.* (Emphasis in original).
[24] *Id.*
[25] *Id.*

VALUATION" is the following: "$2.50 per 1,000 worth of valuation per month."

Option B provides a space for the value to be filled in.[26] The box next to this option was checked and the amount of $20,000 was handwritten next to "Amount of valuation."[27] Option C, defines the "replacement cost value" as "the cost, at the time of loss of a new article identical to the one lost or destroyed."[28] This section contains a table listing valuation amounts and the corresponding premiums based on $250 and $500 deductibles.[29]

The lowest valuation amount of $20,000 was circled along with the corresponding $215 premium based on a $250 deductible.[30] Above the column listing the premium, is the following handwritten notation: "$0 billed."[31] Sterling testified that for all jobs with customers involving Contractor, the deductible is waived.[32] Subcontractor absorbs the cost of the deductible.[33] Below the table is a section where an individual can write in the valuation amount, deductible, and

---

[26] *Id.*

[27] *Id. See also* Sterling Dep. at 21: 1-3 (testifying that Section B covers customers if their property is damaged while in storage, while the Valuation Provision covers damage that occurs during transportation).

[28] Moving Contract. Option C states that "[w]hen the identical article is not available, replacement cost value shall mean the cost of a new article similar to that damaged or destroyed and which is of comparable quality and usefulness."

[29] *Id.*

[30] *Id.*

[31] *Id.*

[32] Sterling Dep. at 26: 18-24; 27: 1-4; 29: 16-18.

[33] Hopkins Dep. at 50: 15-19 ("Q: When you waive the deductible, does that mean Vanliner [Subcontractor's Insurer] pays the extra 250 or you chip that in?" . . . A: "We pay it.").

7

premium due.[34] "20,000" is handwritten as the valuation amount, the deductible is listed as $0, and the premium is $215.[35]  In this section ("Option C"), next to "Customer Signature," Plaintiff signed her name.[36]

The form also contains signature lines on the bottom of the form for the customer and employee of Subcontractor ("Driver").[37]  The following notice is printed above the signature lines toward the bottom of the form:

> "[u]nless a greater value is stated herein, the customer declares, that the value, in case of loss or damage . . . and the liability of the mover, for each or any piece or package and the contents thereof, does not exceed and is limited to sixty (60 cents) per pound per article . . . such customer having been given the opportunity to declare a higher valuation, without limitation, in case of loss or damage from any cause which would make the mover liable and to pay the higher rates based thereon."[38]

Plaintiff signed her name above the line for "Customer" and an employee of Subcontractor wrote "To Be Billed" above the signature line for "Driver."[39]  The valuation amount of $20,000 in section C of the form was circled when it was provided to her. [40]

---

[34] Moving Contract.
[35] *Id.*
[36] *Id.*
[37] *Id.*
[38] *Id.*
[39] *Id.*; Aff. ¶ 5.
[40] *Id.*; Aff. ¶ 6.

## C. Circumstances Surrounding the Execution of the Contract

Plaintiff avers in her Affidavit that she "was not provided time to review or read the contract," that she was not told that she could change the valuation amount, and that she "was told to just sign."[41] Plaintiff avers that no one explained the terms of the Valuation Provision before she signed the Contract; specifically no one explained that she should calculate the value of her property, could change the coverage amount, or told that the Provision could function as a waiver.[42]

Plaintiff further avers that she would not have signed had she known that the Valuation Provision "meant a waiver that limited any and all possible damage relating to the move," and that she would not have chosen a limit of $20,000.[43] Plaintiff contends that she would not have been able to calculate the value of her property because Subcontractor had already placed it onto the truck when an employee presented the Contract to her.[44]

Subcontractor did not appraise the value of Plaintiff's property before the move.[45] Sterling testified that he selects the $20,000 amount on estimates and that $20,000 was the minimum coverage he would add to customers who hired

---

[41] Aff. ¶¶ 5-6.
[42] Aff. ¶¶ 4-7.
[43] Aff. ¶ 7; *see also* Gibellino Dep. at 38: 13-18 (Q: "was it obvious to Gibellino Construction [Contractor] that they might be releasing Delaware Moving and Storage [Subcontractor] from liability for damages caused beyond a certain number?" A: "No.").
[44] Aff. § 7.
[45] Hopkins Dep. at 38: 14-23; *see also* Sterling Dep. at 6: 8-13; 18: 4-15.

Contractor.[46]  Sterling also testified that at the time he met with Plaintiff there was not a habit of discussing the valuation options with customers, but that he would explain it if asked.[47]  Hopkins testified that "we let the customer determine what their valuation coverage is . . . when we give them the contract at the start of the move."[48]   Contractor paid $15,875 to Subcontractor for its moving and storage services, which included the $215 premium.[49]

On January 23, 2020, Subcontractor removed Plaintiff's household furnishings from storage and returned them to her home.[50]  Plaintiff's claims against Subcontractor arise from damage that Subcontractor allegedly caused to Plaintiff's household furnishings in the process of their removal, storage, and/or return to Plaintiff's home.[51]  Plaintiff notified Subcontractor that Subcontractor had caused damage to Plaintiff's property in the amount of $53,757.[52]  Subcontractor tendered Plaintiff's damage claim to Subcontractor's insurer, which paid $7,785 to repair

---

[46] *See* Sterling Dep. at 18: 4-11; 19: 9-12.
[47] Sterling Dep. at 31: 11-14.
[48] Hopkins Dep. at 41: 18-24; 42: 1.
[49] Subcontractor Invoice, Ex. 2 to Contractor's Reply to Mot. Summ. J.  In the Moving Contract, the estimated cost of moving and storing Plaintiff belongings is $13,067.  Gibellino testified to his belief that Contractor paid around $15,800 to Subcontractor for Subcontractor's services. (Gibellino Dep. at 34: 4-8); Sterling Dep. at 23: 3-4; 27: 13-16 (testifying that Contractor pays the cost of the premium to Subcontractor); Hopkins Dep. at 13: 14-16 (testifying that the premium was paid to Subcontractor).
[50] Compl. ¶ 11; Hopkins Aff. ¶ 8.
[51] Compl. ¶¶ 11-12.
[52] Compl. ¶¶ 12-13.

some of the damaged items, but has refused to issue any further payment unless and until Plaintiff signs an agreement limiting Subcontractor's liability to $20,000.[53]

### III. PROCEDURAL HISTORY

On May 17, 2021, Plaintiff filed her complaint listing 6 counts against Subcontractor and 6 counts against Contractor.[54] Plaintiff alleges that Subcontractor caused damage to her property in the amount of $53,757.[55] On June 14, 2021, Subcontractor filed a Motion to Dismiss the following counts against Subcontractor: Negligence (Count I), breach of implied covenant of good faith and fair dealing (Count V), fraudulent inducement (Count VI), and negligent misrepresentation (Count VII).[56] On October 22, 2021, the Court held oral argument on Subcontractor's motion.[57] The Court granted Subcontractor's motion and dismissed those counts.[58] The two remaining counts against Subcontractor are for breach of

---

[53] Compl. ¶ 24.
[54] The counts in the Complaint are as follows: Count I: negligence against Subcontractor, Count II: negligence and Respondeat Superior against Contractor, Count III: breach of contract against Contractor, Count IV: breach of contract against Subcontractor, Count V: breach of implied covenant of good faith and fair dealing against Defendants, Count VI: fraudulent inducement against Defendants, Count VII: negligent misrepresentation against Defendants, and Count VIII: consumer fraud against Defendants.
[55] Compl. ¶¶ 11-12.
[56] Def. Mot. Dismiss.
[57] *Waters v. Delaware Moving & Storage, Inc.,* C.A. No. N21C-05-130 (MAA) (Del. Super. Oct. 22, 2021), Judicial Action Form.
[58] *Id*; *Waters v. Delaware Moving & Storage, Inc.,* C.A. No. N21C-05-130 (MAA) (Del. Super. Oct. 22, 2021) (TRANSCRIPT at 35: 11-13). The Court dismissed the counts of negligence, fraudulent inducement, and negligent misrepresentation, finding that these counts violated the Economic Loss Rule pursuant to *McKenna v. Terminex Intern. Co.,* 2006 WL 1229674 (Del. Super. Mar. 13, 2006) and *International Fidelity Ins. Co. v. Mattes Electric, Inc.,* 2002 WL 1400217 (Del. Super. June 27, 2002).

contract (Count IV) and consumer fraud (Count VIII).[59]  On August 13, 2022, Plaintiff filed the instant motion for partial summary judgment.  On September 9, 2022, Subcontractor filed its motion for partial summary judgment.  These cross-motions seek summary judgment on whether the Valuation Provision in the Moving Contract is valid and enforceable as a matter of law.[60]  On December 20, 2022, the Court held oral argument on the motions and reserved decision.[61]  On February 15, 2023, the Court requested additional briefing on the law regarding limitations of liability in  bailment contracts, *i.e.* carrier contracts.[62]  The parties completed this additional briefing on April 13, 2023 and the motions are now ripe for adjudication.

Contractor filed its motion for summary judgment on Plaintiff's breach of contract claim on February 2, 2023.  Plaintiff filed her response on March 6, 2023 and Contractor filed its reply on March 21, 2023.  This motion is also ripe for adjudication.

---

[59] Compl. ¶¶ 47-52, 80-83; *Waters v. Delaware Moving & Storage, Inc.*  C.A. No. N21C-05-130 (MAA) (Del. Super. Oct. 22, 2021), Judicial Action Form; *Waters v. Delaware Moving & Storage, Inc.,* C.A. No. N21C-05-130 (MAA) (Del. Super. Oct. 22, 2021 (TRANSCRIPT at 35:11-13).
[60] Pl. Mot. Part. Summ. J. Br. at 7; Subcontractor's Mot. Part. Summ. J. Br. at 1-2.
[61] *Waters v. Delaware Moving & Storage, Inc.,* C.A. No. N21C-05-130 (MAA) (Del. Super. Oct. 22, 2021), Judicial Action Form.
[62] *Waters v. Delaware Moving & Storage, Inc.,* C.A. No. N21C-05-130 (MAA) (Del. Super. Feb. 15, 2023), Transaction ID 69154433.

## IV.    CROSS MOTIONS FOR SUMMARY JUDGMENT

## A.    THE PARTIES' POSITIONS

The parties each make a series of arguments regarding the validity of the Valuation Provision.  In Plaintiff's initial brief in support of her motion for partial summary judgment, she contends that the Valuation Provision is void on three grounds: (1) the clause is unreasonable considering the foreseeable damages; (2) the clause is not conspicuous and not agreed upon by the parties; and (3) the clause is unconscionable as a matter of law.[63]

In Plaintiff's response to the Court's request for additional briefing, Plaintiff asserts that bailment caselaw and the factual record in this case further affirms that the Valuation Provision is void and unenforceable.[64]  Plaintiff asserts that the Valuation Provision is void because Subcontractor failed to assess the actual value of Plaintiff's property, did not provide Plaintiff with an "actual choice regarding the Limitations Clause value," and did not explain the Provision prior to execution.[65] Plaintiff further asserts that carrier contracts are subject to higher standards for clarity and understanding because they are contracts of adhesion, and therefore provisions are strictly construed against the carrier.[66]  Plaintiff alleges that the bailor

---

[63] Pl. Mot. Part. Summ. J. Br. at 7.
[64] Pl. Supp. Br. at 5.
[65] *Id.* at 6.
[66] *Id.*

or shipper needs to have actual knowledge of a limitation provision for it to be valid.[67]

Plaintiff asserts "a correct valuation is necessary to determine the reasonableness of the limitations clause."[68] Plaintiff argues the word "value" in 6 *Del. C.* § 7-309(b), relating to contractual limitations of a carrier's liability, to mean the actual and correct value of the goods to be transported.[69] Plaintiff takes the position that the Delaware Superior Court in *Dunfee v. Blue Rock Van & Storage, Inc.*[70] upheld the liability limitations provision because the "contract fairly spells out the limitation of liability and contains a provision for increased charges and additional insurance where an excess value is declared."[71] Plaintiff contends that "Defendant [Subcontractor] was the only party who had the foresight, ability, and opportunity to ascertain Plaintiff's damages."[72]

---

[67] *Id.* at 11 (citing *Dunfee v. Blue Rock Van & Storage, Inc.,* 266 A.2d 187, 189 (Del. Super. Apr. 30, 1970)); *Calvin Klein Ltd.,* 892 F.2d 191, 194 (2nd Cir. 1989); *Coutinho & Ferrostall, Inc. v. M/V Fed. Rhine,* 799 F. Supp. 2d 550 (D. Md. 2011); 8A AM. JUR 2d *Bailments* § 88.

[68] Pl. Supp. Br. at 7.

[69] *Id.* at 6-7. *See infra* n. 99-101 and accompanying text for a discussion of 6 *Del. C.* § 7-309(b).

[70] 266 A.2d 187 (Del. Super. Apr. 30, 1970).

[71] Pl. Supp. Br. at 7 quoting *Dunfee,* 266 A.2d at 189. *See infra* nn. 111-118 and accompanying text for a discussion of *Dunfee.* The remainder of the cases Plaintiff cites to support her position that the liability limitation must reflect the actual value of the goods are from other jurisdictions outside of the Third Circuit. *See* Pl. Supp. Br. at 7-8 quoting *Federal Ins. Co. v. Transconex, Inc.,* 430 F. Supp. 290, 295 (D.P.R. 1976); *Rappaport v. Storfer Bros., Inc.,* 138 N.Y.S.2d 584, 588 (N.Y. Ct. 1955); *Bauer v. Jackson,* 15 Cal. App. 3d 358, 367 (Cal. Ct. App. 1971); *Hogan Transfer & Storage Corp. v. Waymire*, 399 N.E.2d 779 (Ind. Ct. App. 1980).

[72] Pl. Supp. Br. at 10.

Subcontractor asserts in its initial brief in support of its motion for partial summary judgment that the Valuation Provision is valid and enforceable, and that Plaintiff's recovery is therefore limited to $20,000. In Subcontractor's supplemental brief, it asserts that Sections 7-204(b) and 7-309(b) of Title 6 of the Delaware Code and caselaw on bailment contracts support upholding the Valuation Provision. Subcontractor notes that these sections are in alignment with the Federal Motor Carrier Safety Regulations that similarly permit carriers to limit their liability through such valuation provisions.[73] Subcontractor contends that *Dunfee* supports upholding the Valuation Provision in this case.[74]

## B. STANDARD OF REVIEW

To succeed on a motion for summary judgment, the moving party must demonstrate that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.[75] When considering a motion for summary judgment, the Court must view the facts in the light most favorable to the non-moving party.[76] "If a defendant, as the moving party, can establish that there is no genuine issue of material fact, and the defendant is entitled to judgment as a matter of law, the burden will shift to the plaintiff to show the existence of specific facts to support the

---

[73] 49 U.S.C. § 14706 (1935); 49 C.F.R. § 375.203.
[74] 266 A.2d 187, 189 (Del. Super. Apr. 30, 1970).
[75] Super. Ct. Civ. R. 56(c).
[76] *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979).

15

plaintiff's claim."[77] A genuine issue of material fact arises when "any rational trier of fact could infer that plaintiffs have proven the elements of [a] prima facie case by clear and convincing evidence."[78]

Pursuant to Superior Court Civil Rule 56(h), "where the parties have filed cross-motions for summary judgment and have not presented argument to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions." The filing of cross-motions for summary judgment, however, does not equate to a concession of an absence of material fact.[79] "Rather, a party moving for summary judgment concedes the absence of a factual issue and the truth of the nonmoving party's allegations only for the purposes of its own motion, and does not waive its right to assert that there are disputed facts that preclude summary judgment in favor of the other party."[80] "Thus, 'the mere filing of a cross motion for summary judgment does not serve as a waiver of the movant's right to assert the existence of a factual dispute as to the other party's motion.'"[81]

---

[77] *Singletary v. American Indep. Ins. Co.*, 2011 WL 607017, at *1 (Del. Super. Jan. 31, 2011).

[78] *Id.* (citing *Cerebus Intl. LTD. V. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1149 (Del. 2002)).

[79] *Lukk v. State Farm Mut. Auto. Ins. Co.*, 2014 WL 4247767, at *3 (Del. Super. Aug. 27, 2014) (internal citations omitted).

[80] *Id.* (quoting *Fox v. RC Fabricators, Inc.*, 2013 WL 6916917, at *2 (Del. Super. Dec. 20, 2013)) (internal citations omitted).

[81] *Id.* (quoting *JJID, Inc. v. Del. River Indus. Park, LLC*, 2007 WL 2193735, at *3 (Del. Super. July 30, 2007)) (internal citations omitted).

16

"Summary judgment is especially appropriate where the motion is based only upon legal claims, and there are no material facts in dispute."[82] When the contested issue is the proper interpretation of a contract, summary judgment is only appropriate when the language at issue is clear and unambiguous.[83] Therefore, the threshold inquiry when presented with a contract dispute on a motion for summary judgment is whether the contract is ambiguous.[84] Both Plaintiff and Subcontractor have filed motions for partial summary judgment on whether, as a matter of law, the Valuation Provision purporting to limit Plaintiff's claim of damages to $20,000, is valid and enforceable.[85] Thus, the Court may grant summary judgment if the Valuation Provision is clear and unambiguous.

## C. REVIEW OF THE LAW ON BAILMENTS

The facts of this case implicate general principles of contract law and, more specifically, the law on bailments. Plaintiff's claims against Subcontractor arise primarily from damage that Subcontractor allegedly caused to Plaintiff's property in the process of transporting and storing same.[86] Before addressing the Valuation

---

[82] *Clark v. Kelly,* 1999 WL 458625, at *3 (Del. Ch. June 24, 1999).
[83] *See GMG Capital Inv., LLC v. Athenian Venture Partners I, L.P.,* 36 A.3d 776, 783 n. 25 (Del. 2012) (collecting cases upholding award of summary judgment where contractual language was clear and unambiguous) ; *United Rentals, Inc. v. RAM Holdings, Inc.,* 937 A.2d 810, 830 (Del. Ch. Dec. 21, 2007) ("When the issue before the Court involves the interpretation of a contract, summary judgment is appropriate only if the contract in question is unambiguous."). *Id.*
[84] *United Rentals, Inc.,* 937 A.2d at 830.
[85] Pl. Mot. Part. Summ. J. at 4; Def. Mot. Part. Summ. J. at 1-2.
[86] Compl. ¶¶ 11, 27-31.

Provision, this decision outlines the legal framework guiding the Court's analysis as informed by the law on bailments and general principles of contract law.

### 1. General Principles of the Bailment Relationship

Delaware courts have defined a bailment " as a delivery of personal property by one person, the bailor, to another, the bailee, who holds the property for a certain purpose, usually under an express or implied-in-fact contract."[87] "[A] bailment involves a change in possession but not in title."[88] "Inherent in the bailment relationship is the requirement that the property be returned to the bailor, or duly accounted for by the bailee, when the purpose of the bailment is accomplished."[89]

"Because a bailment is a contractual arrangement, the bailment contract is governed by the same rules of law that govern other contracts."[90] "Transactions to which the law of bailments applies include . . . the delivery and acceptance of custody of personal property for safekeeping, transportation, or storage." In

---

[87] *Parseghian v. Frequency Therapeutics, Inc.*, 2023 WL 3533479, at *5 (Del. Super. May 18, 2023) (quoting *Devincentis v. European Performance, Inc.,* 2012 WL 1646347, at *4 (Del. Super. Ct. Apr. 17, 2012)) (citing BLACK'S LAW DICTIONARY, (9th ed. 2009)); *see also Sports Complex, Inc. v. Golt,* 647 A.2d 382 (TABLE), 1994 WL 267697, at *1 (Del. 1994) (internal quotations omitted); *Lee Tire & Rubber Co. of State of N.Y. v. Dormer,* 108 A.2d 168 (Del. 1954) (affirming the trial court's statement of law on bailments: "Now, briefly, a bailment is a contract, such as arises where one delivers property to another to keep for hire either express or implied. It is where the control and possession of the property passes to the bailee, commonly designated as the keeper."). *Id.*

[88] *Bailment*, BLACK'S LAW DICTIONARY (8th ed. 2004); *see also* 8A AM. JUR. 2d § 1 (2023) (defining a bailment as a legal relationship that is "created by the delivery of personal property by one person to another in trust for a specific purpose, pursuant to an express or implied contract to fulfill that trust.").

[89] 8A AM. JUR. 2d at § 29 (2023).

[90] *Id.*

18

Delaware, courts require "either an express or implied contract before a bailment will be found."[91]  When a bailment relationship has been established by express or implied contract and plaintiff's property has been lost, damaged or destroyed, the plaintiff can elect to sue in tort or contract.[92]

## 2.    Limiting the Liability of a Bailee in Documents of Title

In the bailment context, the contract is often expressed in a document of title.[93] Bills of lading and warehouse receipts are documents of title.[94]  Section 1-201 of Title 6 of the Delaware Code defines a bill of lading as "a document of title

---

[91] *Torrent Pharma, Inc. v. Priority Healthcare Distribution, Inc.,* 2022 WL 3272421, at *6 (Del. Super. Aug. 11, 2022) (quoting *Manchester Equip. Co., Inc. v. Am. Way Moving & Storage, Inc.*, 176 F. Supp. 2d 239, 245–46 (D. Del. 2001).

[92] *See Celanese Corp. of America v. Mayor and Council of Wilmington,* 78 A.2d 249, 250 (Del. Super. Dec. 29, 1950) (where plaintiff sought compensation for damage caused to her goods stored in defendant's warehouse, the court found plaintiff had right to sue for breach of a bailment contract, which would require a showing of the following elements: proof of the contract, delivery of the goods in good condition, their return in bad condition, and the amount of damage."); *Devincentes v. European Performance, Inc.,* 2012 WL 1646347, at *4 (Apr. 17, 2012) (holding plaintiff could bring breach of bailment contract action when plaintiff's car was stolen and damaged while in possession of Defendant-automotive shop owner); *Ellis v. Tri State Realty Assoc. LP,* 2015 WL 993438, at *8 (Del. Super. Feb. 27, 2015) (holding breach of bailment claim limited by the valuation provision in the contract, where defendant-storage company wrongfully sold plaintiff's stored property to a third party); *Nelson v. Jones,* 2021 WL 5782384, at *3 (Del. C.P. Nov. 29, 2021) (finding a bailment relationship was established when plaintiff left his vehicle in the care of defendant-auto shop and that plaintiff had a cause of action in tort or contract to recover the value of his vehicle).

[93] 6 *Del. C.* § 1-201(16) defines "Document of title" as "a record (i) that in the regular course of business or financing is treated as adequately evidencing that the person in possession or control of the record is entitled to receive, control, hold, and dispose of the record and the goods the record covers and (ii) that purports to be issued by or addressed to a bailee and to cover goods in the bailee's possession which are either identified or are fungible portions of an identified mass.  The term includes a bill of lading, transport document, dock warrant, dock receipt, warehouse receipt . . . ."

[94] *Id.*

evidencing the receipt of goods for shipment issued by a person engaged in the business of directly or indirectly transporting or forwarding goods. The term does not include a warehouse receipt."[95] Section 1-201 also defines a warehouse receipt as "a document of title issued by a person engaged in the business of storing goods for hire."[96]

Sections 7-204 and 7-309 of the Delaware Uniform Commercial Code ("UCC") directly address liability limitations contained within warehouse receipts and bills of lading, respectively.[97] Section 7-204 reads:

> "[d]amages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage beyond which the warehouse is not liable . . . On request of the bailor in a record at the time of signing the storage agreement or within a reasonable time after receipt of the warehouse receipt, the warehouse's liability may be increased on part or all of the goods covered by the storage agreement or the warehouse receipt. In this event, increased rates may be charged based on an increased valuation of the goods."[98]

Section 7-309(b) of the Delaware code, relating to contractual limitations of a carrier's liability, reads:

---

[95] *Id.* § 1-201(6). Similarly, Black's Law Dictionary defines a bill of lading as "[a] document acknowledging the receipt of goods by a carrier or by the shipper's agent and the contract for the transportation of those goods; a document that indicates the receipt of goods for shipment and that is issued by a person engaged in the business of transporting or forwarding of goods." *Bill of lading*, BLACK'S LAW DICTIONARY (8th ed. 2004).
[96] 6 *Del. C.* § 1-201(42).
[97] *Id.* §§ 7-204(b) & 7-309(b).
[98] *Id.* § 7-204(b).

"[d]amages may be limited by a term in the bill of lading or in a transportation agreement that the carrier's liability may not exceed a value stated in the bill or transportation agreement if the carrier's rates are dependent upon value and the consignor is afforded an opportunity to declare a higher value and the consignor is advised of the opportunity."[99]

The comment to Section 7-309 clarifies that "a bill of lading may also serve as the contract between the carrier and the bailor" and that subsection (b) applies not only to a carrier's liability based on negligence, but also to its liability as an insurer.[100] "Subsection (b) allows the term limiting damages to appear either in the bill of lading or in the parties' transportation agreement."[101]

### 3.      Review of the Caselaw

There are a limited number of recent Delaware cases involving the intrastate transport or storage of goods by a carrier that directly address whether a provision

---

[99] *Id.* § 7-309(b).
[100] *Id.* § 7-309 (Comment).
[101] *Id.*

purporting to limit the carrier's liability is enforceable.[102] The Court, therefore, looks to decisions from other jurisdictions within the Third Circuit.[103]

### a. Delaware Caselaw

Delaware precedent establishes that, when certain conditions are met, a carrier or warehouseman can limit its liability for loss or damage to an owner's property in the storage contract.[104] A storage contract complies with Section 7-204 when it "fairly spells out the limitation of liability and contain a provision for increased charges and additional insurance where an excess value is declared."[105]

In *Ellis v. Tri State Realty Assoc. LP*, the plaintiff brought a claim for breach of bailment and breach of contract, among other tort claims, after Defendant-storage company wrongfully sold the plaintiff's stored property to a third party.[106] The

---

[102] There are a plethora of Third Circuit cases involving claims for damage caused in the context of interstate transportation, as opposed to intrastate transport; however, interstate transportation cases are governed by the Carmack Amendment to the Interstate Commerce Act. 49 U.S.C. § 14706. The Carmack Amendment "preempts all state law claims arising out of the interstate transportation of household goods by a common carrier." *Tayloe v. Kachina Moving & Storage,* 16 F. Supp. 2d 1123, 1127 (D. Ariz. 1998) (internal citations omitted). Pursuant to "the Carmack Amendment, a common carrier is liable to the shipper for 'actual loss or injury to property.'" *Id.* § 14706(a)(1). However, a carrier may limit its liability for any such damage pursuant to *Id.* § 14706(c)(1). Such a limitation is "contractual in nature and thus must be effectuated through a written agreement with the shipper evidencing the shipper's 'absolute, deliberate and well-informed choice.'" *American Cyanamid Co. v. New Penn Motor Express, Inc.,* 979 F.2d 310, 313 quoting *Carmana Designs Ltd. v. North American Van Lines, Inc.*, 943 F.2d 316, 319 (3d. Cir. 1991). Plaintiff's contract claim is not governed by the Carmack Amendment because the transportation of her goods was intrastate.
[103] The Court also analyzes a decision from the District Court of Maryland in addition to cases from the Third Circuit. *See infra* nn. 130-37 and accompanying text.
[104] *See infra* nn. 105-118.
[105] *Dunfee v. Bluerock Van & Storage, Inc.,* 266 A.2d 187, 189 (Del. Super. Apr. 30, 1970).
[106] 2015 WL 993438, at *1-3 (Del. Super. Feb. 27, 2015).

contract contained a "value limit" provision whereby the plaintiff agreed to not store property with a value in excess of $5,000 without prior written consent, and agreed that the defendant's maximum liability was $5,000.[107]  The court held that the relationship between the parties was defined by contract and that therefore, the duties owed arose from that contract.[108]  The court further held that, the breach of contract and bailment claims were limited by the value limit clause of the contract: "[s]uch a limitation is equivalent to the contractual limitation on the value of goods to be stored in the Unit.  In other words, the limitation is equivalent to the risk which [the defendant] agreed to bear in the Contract."[109]  The court found that this provision was enforceable and held that the plaintiff's recovery was limited to $5,000.[110]

*Dunfee v. Blue Rock Van and Storage, Inc.* involves a plaintiff-bailor who sued in negligence after her goods were destroyed while in storage at a warehouse owned by defendant-bailee.[111]  On the morning of trial, the court permitted the defendant to amend its answer to plead a limitation of liability provision contained in its warehouse receipt, which purported to limit the plaintiff's recovery to

---

[107] *Id.* at *4. The "value limit" clause of the contract read: "OCCUPANT agrees not to store property with a total value in excess of $5,000 without prior written consent of OWNER, which consent may be withheld in OWNER'S sole discretion and, if such written consent is not obtained, the total value of OCCUPANT'S property shall be deemed not to exceed $5,000.  OCCUPANT further agrees that the maximum liability of OWNER to OCCUPANT for any claim by OCCUPANT . . . is $5,000."

[108] *Id.* at *7.

[109] *Id.* at *8.

[110] *Id.*

[111] 266 A.2d 187, 187-89 (Del. Super. Apr. 30, 1970).

$1,000.[112] The jury returned a verdict of $5,500.[113] The plaintiff filed a post-trial motion arguing that the court erred in permitting the defendant to amend its answer.[114]

The court issued a post-trial *per curiam* decision which addressed whether it was proper for the trial court to permit the defendant to amend its answer pursuant to Superior Court Civil Rule 15(c), and whether the limitations provision in the warehouse receipt, which limited coverage to ".60 per pound, per article" complied with 6 Del. C. § 7-204(b).[115] The court held that it was not error to permit the defendant to amend its answer because the plaintiff testified to her knowledge of the coverage limit and therefore could not claim surprise or severe prejudice from this last minute amendment.[116] As to compliance with Section 7-204(b), the court held that it "[could not] read the statute to intend that a monetary limitation must be based upon either item or weight, without any possibility of using both, even though circumstances might so require."[117] "Where the storage contract fairly spells out the limitation of liability and contains a provision for increased charges and additional

---

[112] *Id.* at 188.
[113] *Id.*
[114] *Id.*
[115] *Id.* at 188-89.
[116] *Id.*
[117] *Id.* at 189.

insurance where an excess value is declared, there is substantial compliance with the requirements of the statute."[118]

### b. Third Circuit Caselaw Outside of Delaware

Caselaw from other jurisdictions within the Third Circuit have enforced limitation of liability provisions in transportation and storage agreements, including when the plaintiff-bailor alleges that they were unaware of such provision.[119]

In *Kane v. U-Haul Intern., Inc.*, the U.S. Court of Appeals for the Third Circuit affirmed the District Court's grant of summary judgment to defendant-storage company, holding that the exculpatory clause in the storage contract, which exempted the defendant from claims of loss or damage to stored property, was enforceable and limited the plaintiffs' recovery to the insurance policy.[120]

The plaintiffs claimed that the exculpatory clause was unenforceable because they had unequal bargaining power and because the clause was unconscionable.[121] The court stated that, pursuant to New Jersey law, "exculpatory clauses in private agreements that do not adversely affect the public interest are generally sustained" unless there is a "public duty to perform, there is unequal bargaining power between the parties, or the clause is unconscionable."[122] The court found that there was not

---

[118] *Id.*
[119] *See infra* nn. 120-29.
[120] 218 Fed. Appx. 163, 165-67 (3d Cir. 2007).
[121] *Id.* at 166-67.
[122] *Id.* at 165-66.

unequal bargaining power because, although the form was standardized, the plaintiffs had an opportunity to purchase insurance for an additional reasonable fee, the clause was clear, and plaintiffs signed the form.[123]  The exculpatory clause was not unconscionable because the plaintiffs had a choice to purchase insurance, there were other storage companies plaintiffs could have contracted with, and there was no economic compulsion for plaintiffs to rent the units.[124]

In *Sylvestri v. South Orange Storage Corp.,* the plaintiff had stored her fridge in the defendant's warehouse facility and entered into a contract which included a provision whereby the plaintiff agreed that the value of the stored property, in the case of loss or damage, did not exceed $50 unless the plaintiff selected a higher value.[125]  The plaintiff did not select a higher value.[126]  The court reasoned that the bailment relationship is "essentially the commonly one of contract" and that parties may contract to diminish a bailee's liability if such limitation was not "offensive to law or public policy."[127]  The court found that the plaintiff was on notice of this limitation even though the plaintiff alleged it was not called to her attention and she

---

[123] *Id.* at 166.
[124] *Id.*
[125] 81 A.2d 502, 503-04 (N.J. Super. Ct. App. Div. June 19, 1951). The valuation provision read that, "[u]nless a greater value is stated herein, the depositor declares that the value in case of loss or damage . . . does not exceed and is limited to fifty dollars . . . such depositor having been given the opportunity to declare a higher valuation without limitation . . . ." *Id.*
[126] *Id.* at 504.
[127] *Id.*

did not read this particular provision.[128]  The court held, therefore, that Plaintiff's recovery was limited to $50.[129]

In *Coutinho & Ferrostaal, Inc. v. M/V Federal Rhine,* the defendant-bailee filed a request for a declaratory judgment that the liability limitation provision in its warehouse receipt was reasonable and enforceable and limited the plaintiff-bailor's recovery for its damaged goods.[130]  The provision purported to limit the plaintiff's recover  to "10 times the provided, per ton, monthly storage rate[,]" the monthly storage rate being $1.50 per metric ton.[131]

The United States District Court for the District of Maryland applied Section 7-204(b) of the Maryland Commercial Code, which states that a "warehouseman can limit its liability by a term in its warehouse receipt."[132]  The court held that the plaintiff did not rebut the presumption that it received the full warehouse receipt and, therefore, had actual notice of the provision limiting liability.[133]  The court also found that the provision was unambiguous and enforceable.[134]  The provision was not ambiguous for not having an actual storage rate because Section 7-204 did not require the defendant to customize its form for each transaction.[135]  Although the

---

[128] *Id.* at 505-06.
[129] *Id.* at 506.
[130] 799 F. Supp. 2d 550, 551-552 (D. Md. 2011).
[131] *Id.* at 552.
[132]  *Id.* at 553; MD. CODE ANN., COM. LAW § 7-204(b).
[133] *Id.* at 555.
[134] *Id.* at 554, 556.
[135] *Id.* at 557.

warehouse receipt itself only contained the phrase, "monthly storage rate[,]" the rate letter contained the "per ton monthly storage rate," thus the contract, when read as a whole, was unambiguous.[136] The court also noted that sophisticated parties, like the plaintiff-multinational corporation in this case, are held to a higher standard than members of the general public.[137]

## D. ANALYSIS

The Valuation Provision is valid and enforceable. The Court finds that Plaintiff and Subcontractor entered into a bailment relationship and that the Valuation Provision on its face meets the requirements of sections 7-204(b) and 7-309(b). The Provision is conspicuous, clear, and unambiguous. Plaintiff has not established that the Contract is a contract of adhesion or that the provision is unconscionable.

### 1. Plaintiff and subcontractor entered into a bailment contract.

The Court concludes as an initial matter that the Contract Plaintiff and Subcontractor signed created a bailment relationship by express contract, and that their respective duties and responsibilities are governed by that Contract.[138]

---

[136] *Id.*
[137] *Id.* at 554.
[138] Moving Contract; *Devincentes v. European Performance, Inc.,* 2012 WL 1646347, at *4 (Apr. 17, 2012); *Ellis v. Tri State Realty Assoc. LP,* 2015 WL 993438, at *7 (Del. Super. Feb. 27, 2015) ("The relationship between [Defendant] and [Plaintiff] was created by contract. Because the relationship exists solely by reason of contract, it follows that the duties owed to each other arise solely from the Contract.").

The Contract qualifies generally as a document of title, specifically as both a bill of lading and warehouse receipt.[139] The Contract is a document of title because it is a record regularly issued in Subcontractor's course of business and indicates that Subcontractor is entitled to receive and hold the goods identified.[140] The Contract is a bill of lading because it evidences "the receipt of goods for shipment issued by" Subcontractor, who is "engaged in the business of directly or indirectly transporting or forwarding goods."[141] The Contract also functions as a warehouse receipt because it is an agreement that Subcontractor, a company regularly engaged in storing goods for hire, would assume temporary possession of Plaintiff's goods and place them into storage.[142] This executed Contract is sufficient to establish a bailment relationship under Delaware law.

### 2. The text of the Valuation Provision complies with section 7-309(b).

Section 7-309(b) relating to contractual limitations of a carrier's liability applies to the Valuation Provision in Section C ("Transit Rates – Replacement Cost Value").[143] Section 7-309(b) permits a carrier to limit its liability for damages in a

---

[139] Moving Contract; 6 *Del. C.* §§ 1-201(6), (16), (42).

[140] *Id.*§ 1-201(16); The Contract.

[141] *Id.* § 1-201 (6); Moving Contract ("The undersigned customer hereby orders the undersigned mover to furnish the transportation facilities and services described in this contract . . ."

[142] *Id.*§ 1-201 (42).

[143] *Id.* § 7-309(b). Plaintiff does not contest the validity of the "In-storage" provision (Section B). The Court nevertheless finds that this provision is valid pursuant to 6 *Del. C.* § 7-204(b) relating to contractual limitation of a warehouse's liability. Pursuant to § 7-204(b), "[d]amages may be limited by a term in the warehouse receipt or storage agreement limiting the amount of liability in case of loss or damage beyond which the warehouse is not liable." § 7-204(b). A bailor may

bill of lading or transportation agreement to a value specified therein "if the carrier's rates are dependent upon value and the consignor [customer] is afforded an opportunity to declare a higher value and the consignor is advised of the opportunity."[144] With respect to the Valuation Provision here, the cost of the premium increases with the increase in valuation and the Contract indicates that the customer can choose between levels of valuation ranging from $20,000 to $100,000.[145]

The comment to Section 7-309(b) states that this subsection may apply to a carrier's liability as an insurer.[146] The Valuation Provision in this case attempts to limit Subcontractor's liability as an insurer, because a premium is paid in exchange for Subcontractor reimbursing customers up to the corresponding valuation of their personal belongings in the event they are lost or destroyed in transit.[147] In this case, Plaintiff was provided with $20,000 in coverage at no cost because Contractor paid

---

request an increase in the warehouse's liability when signing the agreement or within a reasonable time after receiving the warehouse receipt and the bailee may increase the rate based on this increased valuation. *Id.*

[144] § 7-309(b).

[145] Moving Contract. The Valuation Provision instructs the customer to see a representative should they wish to select a valuation above $100,000. *Id.* Pursuant to § 7-309(b), "damages may be limited by a term in the bill of lading . . . if the carrier's rates are dependent upon value and the consignor is afforded an opportunity to declare a higher value and the consignor is advised of the opportunity."

[146] § 309(b) (Comment).

[147] Moving Contract.

the premium of $215 to Subcontractor.[148]  Subcontractor also waived the deductible.[149]

Plaintiff argues that the Valuation Provision is invalid because the rates are not dependent upon a correct valuation of Plaintiff's property.[150]  The language of Section 7-309(b), the language of the Contract, and the *Dunfee* decision do not state that a valuation provision must equal the actual value of the property to be valid. Section 7-309(b) only states "to a value specified therein."[151]  The paragraph in the bottom right corner of the Contract confirming customers' understanding of the liability limitations of Subcontractor also states that its rates are based on the "declared or agreed value," the customer having the opportunity to select a higher valuation.[152]  Nowhere in the Contract does it state that the valuation amount is meant to equal the true and accurate value of a customer's property.  Finally, *Dunfee* does not hold that a limitations provision is only valid if the value specified equates to the actual value of the goods.[153]  To the contrary, the court concluded the

---

[148] The invoice from Subcontractor to Contractor includes an itemized list of charges including a charge of $215 for "in transit insurance."  Ex. 2 to Contractor's Reply, Transaction ID 69595244; *see* Sterling Dep. at 23: 3-4; 27:13-16; Dep. of David Hopkins at 13:14-16.

[149] *See* Moving Contract.  In the Valuation Provision of the Contract, next to the line for "Deductible amount," Subcontractor hand-wrote in $0.  *Id.*  Sterling Dep. at 26: 18-24; 27: 1-4; 29: 16-18.

[150] Pl. Supp. Br. at 7 ("Delaware case law interpreting this statute reflects that a correct valuation is necessary to determine the reasonableness of the limitations clause."). *Id.*

[151] *See generally* 6 *Del. C.* § 7-309(b).

[152] Moving Contract.  For ease of reference, this decision hereinafter refers to the paragraph at the bottom right corner of the form as the "declaration of understanding."

[153] *See generally* 266 A.2d 187 (Del. Super. Apr. 30, 1970).

31

defendant was properly allowed to amend its answer to include the limitation provision of $1,000 in light of substantial evidence suggesting that the actual value of the plaintiff's property was much greater.[154]

### 3. Plaintiff's arguments as to voidness lack merit.

Plaintiff makes several arguments as to why the Valuation Provision is void and unenforceable.[155] The Court applies established principles of Delaware contract law to address each in turn. "Delaware adheres to the 'objective' theory of contracts, *i.e.* a contract's construction should be that which would be understood by an objective, reasonable third party."[156] A reviewing court will read the contract as a whole and "enforce the plain meaning of clear and unambiguous language."[157] Courts should endeavor to interpret a contract's meaning so that each provision and term is given effect without rendering any terms "meaningless or illusory."[158]

#### a. An objective reasonable person would understand they were a party to a contract with Subcontractor.

As a preliminary matter, while both "Gibellino Construction" and "Pamela Waters" are listed as "Customers" on the top of the form, the Court finds that

---

[154] *Id.* at 188-89. Plaintiff submitted evidence that she purchased a separate insurance policy of $4,000 to compensate for the insufficient coverage provided by the defendant-storage company. *Id.* at 188. Additionally, the jury awarded damages of $5,500. *Id.*

[155] Pl. Mot. Summ. J. Br. at 7-10; Pl. Supp. Br. at 10-12.

[156] *Weinberg v. Waystar, Inc.,* 2023 WL 2534004, at *4 (Del. 2023) quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[157] *Id.* quoting *Manti Hldgs, LLC v. Authentix Acquisition Co., Inc*., 261 A.3d 1199, 1208 (Del. 2021).

[158] *Id.* (internal quotations omitted).

Plaintiff was on notice that she was Subcontractor's customer as opposed to only Contractor.[159] Considering that Subcontractor was directly providing services to Plaintiff for her benefit, the Court struggles to understand why Plaintiff would not consider herself a customer of Subcontractor. Plaintiff placed her signature on two different places on the form: at the bottom of Section C, next to the line for "Customer Signature" and on the bottom of the form, above the line marked for "Customer." It is evident that Contractor did not sign this form and neither party has asserted that Contractor was present when this form was signed.[160] Moreover, Plaintiff's status as a customer to Subcontractor is not mutually exclusive of Contractor also being a customer of Subcontractor.[161] Although Plaintiff did not directly hire Subcontractor, she hired Contractor, thereby implicitly consenting to Contractor's hiring of Subcontractor.

The Court finds that an objective reasonable third party would have understood that they were a party to the contract. The word "contract" appears in four different places on the document: in the line directly below and to the left of Subcontractor's logo, once in the declaration of understanding, and twice toward the bottom of the contract, above the signature line. For these reasons, the Court finds

---

[159] Moving Contract.
[160] Moving Contract.
[161] Plaintiff had hired Contractor in the past for other services. *See* Gibellino Dep. at 29: 23-24; 30: 1.

33

that an objective reasonable person in Plaintiff's position could have understood that they were a party to a contract with Subcontractor.

### b. Plaintiff's failure to read or review the Contract does not justify its avoidance.

Plaintiff avers in her Affidavit that Subcontractor did not explain the Contract or Valuation Provision to her before or on the day of the move, that she was not told that she should calculate the value of her property or could change the valuation amount, and that she was not provided time to read the Contract.[162] Plaintiff claims in her supplemental brief that a bailor must be charged with notice in the absence of actual knowledge of a limitation of liability[163] and suggests that, pursuant to *Dunfee,* a limitations provision is invalid absent plaintiff's admission that she read, understood, and had knowledge of it.[164] This is not an accurate statement of *Dunfee* or Delaware contract law in general.

"One of the basic tenets of contract law is that a party is responsible for the terms of a contract they sign, even if unaware of the terms" and a party's failure to read a contract cannot justify its avoidance.[165] Plaintiff was provided with the

---

[162] Pl. Aff. ¶¶ 4-7. *See supra* nn. 41-44 and accompanying text for a more detailed recitation of the pertinent parts of Plaintiff's Affidavit.

[163] Pl. Supp. Br. at 12 (quoting 8A Am. Jur 2d Bailments § 88: "[I]n the absence of actual knowledge of such limitation, however, the bailor is not bound thereby unless the bailor is charged with notice under the circumstances of the case").

[164] Pl. Supp. Br. at 11 quoting *Dunfee,* 266 A.2d at 189 ("[a]ll parties understood that the limitations of liability, despite the items, articles, or weight, would not exceed $1,000.00.").

[165] *Moore v. O'Connor,* 2006 WL 2442027, at *4 (Del. Super. Aug. 23, 2006) (quoting *Graham v. State Farm Mut. Auto. Ins. Co.,* 565 A.2d 908, 913 (Del. 1989)); *Graham,* 565 A.2d at 913 (stating

Contract and signed it in two places— on the section for the Valuation Provision and on the bottom of the form.[166] Plaintiff acknowledged by her signature her acceptance of the Contract's terms regardless of whether she was aware or thoroughly read the terms beforehand.

Plaintiff's interpretation of *Dunfee* is incorrect and does not support her position. *Dunfee* does not state that the bailment contract was enforceable on the basis that the plaintiff knew and understood the coverage limit, a finding that would run contrary to the basic tenet of Delaware contract law that "a party's failure to read a contract does not justify its avoidance."[167] The reviewing court in *Dunfee* had two questions before it: (1) whether the plaintiff could establish surprise or severe prejudice from the defendant amending the pleadings to include the limitation provision the morning of trial; and (2) and whether that provision substantially

---

a party's failure to read a contract does not justify its avoidance); *Alabi v. DHL Airways, Inc.*, 583 A.2d 1358, 1362 (Del. Super. Aug. 1, 1990) ("It is an elementary principle of contract law that a person will be bound by the contents of an agreement that he purposely signs but fails to inform himself of the contents of that agreement"); *Johnson v. Colonial Ins. Co.,* 1997 WL 126994, at *2 (Del. Super. Jan. 2, 1997) ("The Court is aware that often times the terms of an insurance policy can be complex and confusing; however, an insured has a duty to read his or her insurance policy."); *Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1180-81 (3d Cir. 1979) ("A person of legal age is presumed to know the meaning of words in a contract, and if, relying upon his own ability, he enters into an agreement not in his best interest he cannot later be heard to complain that he was not acquainted with its contents and did not understand the meaning of the words used in the instrument that he signed).

[166] Moving Contract.

[167] *See Graham,* 565 A.2d at 913.

complied with Section 7-204.[168] The court did not decide whether the plaintiff had sufficient knowledge and understanding of the provision for its enforceability.

With respect to the first question, the court in *Dunfee* held that the defendant was permitted pursuant to Superior Court Civil Rule 15(c) to amend the pleadings because the plaintiff could not claim surprise or severe prejudice when she had admitted to her knowledge of this provision.[169]  Plaintiff's knowledge of that provision was relevant to the question of surprise or severe prejudice, not to the question of voidness.  With respect to the second question, the reviewing court held that "[w]here the storage contract fairly spells out the limitation of liability and contains a provision for increased charges and additional insurance where an excess value is declared, there is substantial compliance with the requirements of the statute."[170]  The court did not hold that substantial compliance with the statute requires evidence that the bailor read and understood the contract prior to signing, or that the limitation of liability was equivalent to the actual value of the goods. Nowhere in the decision did the court hold that sufficient evidence of knowledge and understanding was necessary to uphold the limitations provision.

---

[168] *Dunfee,* 266 A.2d 187, 188 (Del. Super. Apr. 30, 1970).

[169] *Id.*  "If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits." Super. Ct. Civ. R. 15(c).

[170] *Id.* at 189.

Furthermore, even if the court had found that the plaintiff's admission of knowledge was sufficient to enforce the limitations provision, it does not follow that such evidence is necessary for enforceability. Plaintiff here confuses necessary for sufficient. The evidence necessary to defeat a request to amend (surprise or severe prejudice from absence of knowledge) is separate and apart from evidence necessary to void a contractual provision as a matter of law.

Plaintiff elected to sign the form before sufficiently reviewing it. The fact that Plaintiff did not read the form does not mean that she was not on notice as a matter of law. In *Sylvestri,* the court held the plaintiff was on notice and enforced the limitation provision even though the plaintiff alleged she did not read it nor was it called to her attention. [171] Similar to the plaintiff in *Sylvestri,* here, Plaintiff was on notice of the Contract's terms when she was provided with it even if Subcontractor did not call the Valuation Provision to her attention, or if she neglected to read it. Plaintiff's averment in her Affidavit that she was "told to just sign" is not sufficient for the Court to find as a matter of law that Plaintiff was deprived of the option to select greater coverage or was coerced into signing the Contract as is.

---

[171] *See* 81 A.2d 502, 505-506 (N.J. Super. Ct. App. Div. June 19, 1951). "The fact that the plaintiff did not choose to read the paper, or the material parts of it, before signing, or did not know its contents at the time, cannot, in the absence of actual fraud, relieve him from its obligations. This doctrine arises from the well-settled principle that affixing a signature to a contract creates a conclusive presumption, except as against fraud, that the signer read, understood, and assented to its terms." *Id.* at 505 (quoting *Fivey v. Pennsylvania Railroad*, 52 A. 472, 473 (E.&A.1902) and citing decisions in accordance therewith).

### c. The Valuation Provision is sufficiently conspicuous.

Plaintiff alleges that the Valuation Provision is not conspicuous.[172] The Court finds the Provision is sufficiently conspicuous to place Plaintiff on notice of it. Whether a written term is conspicuous is a decision for the Court.[173] Section 1-201 of Title 6 of the Delaware Code defines "conspicuous," with reference to a term, as "so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it." Conspicuous terms include "[a] heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size."[174]

As an initial matter, the Contract is one page in length and for that reason alone the Court finds it difficult that any clause of the contract could have been so hidden or obscured to evade notice by a reasonably prudent person. The body of the Valuation Provision is in the same size font as the rest of the Contract and is located toward the top right of the page. The title of the Provision is in bold, centered, and separated by a space from the body of the Provision. These are all characteristics which should have facilitated notice. The headers of each column in the valuation table are also in bold.[175] Additionally, the Valuation Provision contains its own

---

[172] Pl. Mot. Summ. J. at 6.

[173] 6 *Del. C.* § 1-201(10).

[174] *Id.*

[175] Plaintiff cites to one case to support her contention that a provision must be entirely in bold to be held conspicuous as a matter of law. *Mood v. White,* 2020 WL 996736, at *5 (Del. Super. Mar. 2, 2020) (holding provision was conspicuous because the font was capitalized, in bold, and in plain

signature line on which Plaintiff placed her signature, indicating that her attention was necessarily drawn to this section of the form during its execution. The fact that the entire definition of "Replacement Cost Valuation" itself was not in bold does not mean that it was not conspicuous.

### d. The language of the Contract is sufficiently clear and unambiguous.

With respect to the legal question of whether a contractual provision is ambiguous, this is a determination which "lies within the sole province of the court."[176] When language is unambiguous, courts "will give effect to the plain meaning of the contract's terms and provisions."[177] "Language is ambiguous if it is susceptible to more than one reasonable interpretation. An interpretation is unreasonable if it 'produces an absurd result' or a result 'that no reasonable person would have accepted when entering the contract.'"[178] In analyzing whether the Valuation Provision is ambiguous the Court reads the contract as a whole.[179]

---

language). The Court cannot agree that Delaware law dictates that a provision be held void solely on the basis that it is not in bold font.

[176] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010). The Court notes that Plaintiff first raised the issue of ambiguity in her Supplemental Brief in response to the Court's request for additional briefing. Pl. Supp. Br. at 10. Plaintiff did not raise this issue in the opening brief in support of her Motion for Summary Judgment.

[177] *Manti Hldgs, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021) (quoting *Osborn*, 991 A.2d at 1159–60).

[178] *Id.* (citing *Osborn*, 991 A.2d at 1159-60).

[179] *Weinberg v. Waystar, Inc.* 2023 WL 2534004, at *4 (Del. 2023) (quoting *Manti Hldgs, LLC*, 261 A.3d at 1208).

The Court finds as a matter of law that the Provision is not ambiguous. The Provision is written in plain and clear language and is subject to only one reasonable interpretation. The meaning of the Valuation Provision is informed by predicate language above the section for "VALUATION OPTIONS," the introductory paragraph in the top left section of the form, and the declaration of understanding in the bottom right corner of the form. Predicate language in the top left of the page, states "the undersigned customer hereby orders the undersigned mover to furnish the transportation facilities and services described in this contract pursuant to the terms, conditions and *limitation of liability* contained herein."[180] Thus the beginning of the contract indicates in unequivocal language that the services rendered are subject to limitations of liability contained in the form.

The body of the form is titled "**<u>VALUATION OPTIONS</u>**." This title is in all caps, bolded, underlined, and is spaced apart from the introductory paragraph below. The introductory paragraph reads, "[w]e have listed below the choices available to establish the appropriate valuation in the event of a loss and/or damage." The Court finds that this language is clear and unambiguous and that a reasonable person would understand it to mean that the option selected would dictate how their property would be valued in the event it was lost or damaged. The clause in this first sentence, "in the event" signals to the reader that a valuation of their property would

---

[180] Moving Contract (emphasis added).

take place if or on the condition that their property was lost or damaged and that this valuation would be based on which "choice" they selected in the Contract. The succeeding line instructs the reader to "[p]lease read each of the three choices carefully, *as this will determine the Replacement method* of your household goods and property *if damaged* in Transit and while shipment is in storage."[181] The three choices are titled as "**A No Charge**," "**B IN-STORAGE VALUATION**," and "**C-Transit Rates – Replacement Cost Valuation.**" The letters designating each section are in larger font than the rest of the form, are in all caps, and bolded. The titles for each section are also bolded, the titles for sections A and B printed in all caps.

Section C (the Valuation Provision) explains the meaning of "Replacement Cost Valuation" referenced in the introductory paragraph in plain and unambiguous terms and contains a table, the columns of which have bolded titles for "Valuation Amount" and the two corresponding deductibles. This section further instructs the customer to "please see representative of carrier for higher coverages and premiums" if the customer desires more than $100,000 of valuation coverage. The bottom right of the form, in the same size font, is a declaration of understanding in which the customer declares that the "*liability of the mover for any cause which he may be liable*" is limited to sixty cents per pound "unless a greater value is stated herein"

---

[181] *Id.* (emphasis added).

41

and that the rates are based on the "*declared or agreed value*[,]" "such customer having been given the opportunity to declare a higher valuation, without limitation, in case of loss or damage from any cause which would make the mover liable and to pay the higher rates based thereon."[182]

The Court finds that an objective reasonable person could readily understand the plain meaning of the Valuation Provision, especially when read in conjunction with the language detailed above. The language clearly indicates that, in the event a customer's property was lost or destroyed, that Subcontractor would reimburse the customer for the monetary value of that property up to the valuation amount, and that the value or "replacement cost" was predetermined by the choice selected on the form.

The Court further finds that there is no ambiguity that the Contract was intended to limit Subcontractor's liability for damages. The term "liability" is used twice (predicate language and declaration of understanding) and "liable" is used twice (declaration of understanding). The predicate language states that the customer is ordering the services described "pursuant to" . . . "the limitation of liability contained herein." The declaration states that the "liability of the mover for any cause for which he may be liable" does not exceed 60 cents per pound "[u]nless a greater value is stated herein" and that the customer was "given the opportunity to

---

[182] *Id.* (emphasis added).

declare a higher valuation, without limitation, in case of loss or damage from any cause which would make the mover liable . . . ."[183] There is only one reasonable interpretation of this form: Subcontractor's liability for loss or damage caused to a customer's property is determined by the valuation of the customer's property as indicated by the Contract.

Plaintiff's claim of ambiguity is belied by the fact that she neglects to offer an alternative interpretation of the Valuation Provision. Plaintiff claims only that this provision is not clear or explicit because it does not employ certain terms or formatting and was not explained to her.[184] As detailed above, the Contract, if one reads its terms, is sufficiently clear and unambiguous as a matter of law. If Plaintiff did not sufficiently review the Contract before signing, this was done at her peril.

### e. The Contract is not a contract for adhesion.

The Court does not find that the Contract is a contract of adhesion. A contract of adhesion is typically a standard form contract where the bargaining power of the drafter greatly outweighs that of the other party, and where the terms are presented

---

[183] Plaintiff argues in her Supplemental Brief that the word "limitation" is not used in the Valuation Provision. Pl. Supp. Br. at 12. While this is true, this term is used in the beginning of the Moving Contract. As previously stated, the Court interprets a Contract as a whole and finds that the Valuation provision is informed by this language.

[184] Pl. Mot. Part. Summ. J. at 10-11. Plaintiff alleges she was not on notice that she was agreeing to limiting Subcontractor's liability because the Contract does not include the following terms: "negligence, waiver, damages, or limitations." The predicate language in the Contract includes the phrase "limitation of liability." The Court finds that the phrase in the Declaration paragraph "any cause for which the [mover] may be liable" includes a cause of negligence.

43

on a take-it-or-leave-it basis.[185]  In Plaintiff's case, she had the option of selecting a higher valuation amount.  Although this amount of coverage was circled when Subcontractor handed her the form, she could have opted to review it and select a higher coverage amount.[186]  The form, absent Plaintiff's signature, was not a binding agreement.  The fact that "$20,000" was preselected is not sufficient to establish an absence of choice without additional evidence that Plaintiff was somehow pressured or coerced to accept the Contract on its terms.  Plaintiff has provided no evidence that Subcontractor told her she was limited to this valuation amount and her belief that she was not permitted to select a higher coverage does not convert this Contract into a contract of adhesion.

Even if the terms were presented on a take-it-or-leave-it basis, this is not sufficient to establish that the Contract is a contract of adhesion.[187]  A plaintiff must also show that "the contract at issue was gained through sheer economic force under circumstances where assent to its terms was absent."[188]  In a typical contract of adhesion, "[t]he dominant party knows that the other would not accept the terms,

---

[185] *Contract of Adhesion,* BLACK'S LAW DICTIONARY (8th ed. 2004); *State Farm Mut. Auto. Ins. Co. v. Arms*, 477 A.2d 1060, 1065 (Del. 1984) (explaining insurance contracts are contracts of adhesion because they are complex, employ obscure terminology, and are presented on a take-it-or-leave-it basis).

[186] Hopkins Dep. at 41: 18-20, 22 (testifying that the customer can determine the valuation amount); Sterling Dep. at 51: 11-20 (testifying that, as a general matter, he tells customers the Moving Contract is a contract and testified in the affirmative that the terms of the Moving Contract are negotiable).

[187] *Harbour Cove Marine Serv., Inc. v. Rabinowitz,* 2005 WL 1630871, n. 6 (D.N.J. 2005).

[188] *Id.*

and thus employs the practices of minute print, unintelligible legalese, or high pressure sales technique."[189] Plaintiff has not raised a genuine issue of material fact that any of these circumstances were present in this case. As detailed above, the Contract was one page in length and the language was sufficiently clear and unambiguous for a reasonable person to understand. That Subcontractor provided the Contract to Plaintiff after loading her belongings into the truck and instructing her to sign on the highlighted sections is not sufficient evidence of "high pressure sales techniques."[190]

### f. The Valuation Provision is not unconscionable as a matter of law.

Plaintiff alleges that the Valuation Provision is unconscionable "because a reasonable person in a fair bargaining position would not have agreed to a $20,000.00 limitation on damages."[191] Plaintiff points to the fact that Subcontractor's quote was prepared prior to the moving date and shared with Contractor, but not with Plaintiff; that Subcontractor did not estimate the actual value of her property; and that the move would have been delayed if Plaintiff requested a change in coverage after the move had started.[192]

---

[189] *Brokers Title Co., Inc. v. St. Paul Fire & Marine Ins. Co.*, 610 F.2d 1174, 1180 (3d Cir. 1979).
[190] *Id.*
[191] Pl. Mot. Part. Summ. J. at 12.
[192] *Id.* at 12-13 ("All parties also testified that . . . any change in coverage would have to be approved by the insurer which could delay the move."). *Id.* In support of Plaintiff's assertion that requesting a change in the coverage on the day of the move would have delayed the move, Plaintiff points to specific sections of Sterling's, Hopkins,' and Gibellino's depositions. *Id.* None of the

"Unconscionability is a concept that is used sparingly" and is employed to evaluate the fairness of a contract.[193] "Upholding freedom of contract is a fundamental policy of this State[,]"[194] thus Delaware courts invoke "this doctrine with extreme reluctance and only when all of the facts suggest a level of unfairness that is unconscionable."[195] An unconscionable contract "is one that is so one-sided as to be oppressive"[196] and that "no man in his senses and not under delusion would make on the one hand, and as no honest or fair man would accept, on the other."[197]

To evaluate whether a contract is unconscionable, courts assess "whether [a contractual] provision amounts to the taking of an unfair advantage by one party over the other."[198] "[T]here must be an absence of meaningful choice and contract terms unreasonably favorable to one of the parties."[199] Contracts are not necessarily

---

cited deposition testimony supports Plaintiff's assertion that the move would be delayed if Plaintiff had requested additional coverage on the day of the move. The form only states that if a customer wants "*[o]ver $100,000 of valuation coverage*" that they should see a representative of the company. Moving Contract. Sterling did testify that if a customer selected more than $100,000 in coverage, he would have to ask ownership about addressing such a request, but he did not testify that any change in coverage would delay the move. Sterling Dep. at 53: 12-14.

[193] *Olga J. Nowak Irrevocable Trust v. Voya Financial, Inc.,* 2020 WL 7181368, at *10 (Del. Super. Nov. 30, 2020) (quoting *Ketler v. PFPA, LLC,* 132 A.3d 746, 748 (Del. 2016)).

[194] *Change Capital Partners I, LLC v. Volt Electrical Systems, LLC,* 2018 WL 1635006, at *4 (Del. Super. Apr. 3, 2018) (internal citations omitted).

[195] *Olga,* 2020 WL 7181368, at *10 (quoting *Ryan v. Weiner*, 610 A.3d 1377, 1381 (Del. Ch. 1992)).

[196] *Graham v. State Farm Mut. Auto. Ins. Co.,* 565 A.2d 908, 912 (Del. 1989) (internal citations omitted).

[197] *Ketler,* 132 A.3d at 748.

[198] *Olga,* 2020 WL 7181368, at *11 (quoting *J.A. Jones Const. Co. v. City of Dover*, 372 A.2d 540, 552 (Del. Super. Feb. 28, 1977)).

[199] *Id.* quoting *Ketler*, 132 A.3d at 748.

unconscionable due to a disparity in bargaining power alone.[200] Unequal bargaining power amounts to unconscionability only if the stronger party is using its advantage unfairly and to the detriment of a weaker counterpart.[201]

The Court finds as a matter of law that the Valuation Provision is not unconscionable. There is scant evidence that Subcontractor unfairly exerted its bargaining power to take advantage of Plaintiff. While it is true that Subcontractor is a sophisticated company and Plaintiff a member of the public, there is little, if any, evidence Subcontractor used its position or status to deprive Plaintiff of some advantage. Although the Contract was standardized, there is not sufficient evidence to find that Plaintiff was deprived of selecting a level of coverage.[202] Plaintiff has also not alleged that selecting a valuation amount of $20,000 was unreasonably favorable to Subcontractor.

Additionally, the coverage Subcontractor selected was above the minimum and was selected to prevent the possibility of Plaintiff having only the minimum coverage of sixty cents per pound.[203] This above-minimum coverage was provided

---

[200] *Graham,* 565 A.2d at 912.

[201] *Id.*

[202] *See Kane v. U-Haul, Inc.,* 218 Fed. Appx. 163, 166 (3d Cir. 2007) (holding there was not unequal bargaining power between parties contracting for limitations provision in storage contract even though form was standardized because appellants had choice to purchase additional insurance).

[203] Moving Contract; *see* Sterling Dep. at 19: 9-12 (Q: "Is there any specific reason why it was always $20,000 for Gibellino?" A: "Because they asked to have coverage for their clients."); Hopkins Dep. at 39: 5-11 ("we have an agreement with Gibellino that we will give his

at no cost to Plaintiff. Plaintiff did not pay the premium[204] and Subcontractor waived the deductible.[205] These facts, which are not in dispute, are somewhat at odds with an allegation of unconscionability. Plaintiff has not submitted sufficient evidence of a level of unfairness warranting the Court to employ the doctrine of unconscionability and void the parties' agreement.

In conclusion, the Court finds that the Valuation Provision in the Moving Contract is valid and enforceable, thereby limiting Plaintiff's recovery in her breach of contract claim to $20,000, less the amount Subcontractor's insurance carrier has paid toward her claim. The provision is in compliance with 6 *Del. C.* § 7-309(b) and Plaintiff has not established sufficient grounds for voiding the Contract either on its face or due to circumstances of contract formation. Subcontractor's motion for partial summary judgment is therefore GRANTED and Plaintiff motion for partial summary judgment is DENIED.

---

customers/clients a -- the coverage. We waive the minimal coverage, which is 60 cents a pound. We give them – we offer them $20,000.").
[204] Subcontractor Invoice, Ex. 2 to Contractor's Reply to Mot. Summ. J.; Sterling Dep. at 23: 3-4; 27: 13-16 (testifying that Contractor pays the cost of the premium to Subcontractor); Hopkins Dep. at 13: 14-16 (testifying that the premium was paid to Subcontractor).
[205] *See supra* nn. 32-33.

## V. CONTRACTOR'S MOTION FOR SUMMARY JUDGMENT

## A. FACTS

As explained above, Plaintiff hired Contractor to repair and restore damage that was caused by a tree falling on her home.[206] Contractor prepared a "Repair Estimate" for the cost of repairing and restoring Plaintiff's home.[207] In Plaintiff's claim for breach of contract against Contractor, she refers to the "Contractor Contract with Contractor" she had with Contractor "to repair the property."[208] For ease of reference, and to distinguish this contract from the one-page Moving Contract between Plaintiff and Subcontractor, the Court hereinafter refers to this document as the "Restoration Contract."

The Restoration Contract is thirty pages in length and contains the following header on page one: "Gibellino Construction Company -- Repair Estimate -- 1/27/2020."[209] The purpose of the estimate, as stated on page one, was for "restoration repairs" at Plaintiff's home "as a result of tree impact damage."[210] The Restoration Contract contains an itemized list of services to be performed to restore and repair Plaintiff's property as a result of the tree damage.[211] The section for

---

[206] Compl. ¶ 6.
[207] Ex. 1 to Contractor's Mot. Summ. J. (hereinafter "Restoration Contract").
[208] Compl. ¶ 40.
[209] Restoration Contract at 1. "1/27/2020" is the date that Contractor updated the Restoration Contract with a revised estimate to include additional home repairs. *Id.* Plaintiff hired Contractor on May 29, 2019, the day after Plaintiff's home was damaged by the fallen tree. *Id.*
[210] *Id.*
[211] *See generally id.*

"General Provisions" on page three, item twelve, includes the following service: "Content pack out – per quote from DE Moving & Storage [Subcontractor]" (Content Packout Provision").[212] The parties do not dispute that Contractor unilaterally selected Subcontractor for moving and storage services.[213] The estimated cost for Subcontractor to move and store Plaintiff's property was $18,434.40.[214] The total net claim amount Contractor submitted to Plaintiff's insurance company was $97,132.60, which includes the quote from Subcontractor.[215] Contractor paid Subcontractor for its services from the net claim amount.[216]

## B. BREACH OF CONTRACT CLAIM AGAINST CONTRACTOR

The alleged damage to Plaintiff's household furnishings proximately caused by Subcontractor gives rise to Plaintiff's claims against Contractor.[217] Plaintiff alleges that she entered into the Restoration Contract with Contractor "to repair the property, which included moving and protecting Plaintiff's personal property."[218] Plaintiff alleges that Contractor breached the Restoration Contract when Contractor "used an unqualified, unskilled, and otherwise unsuitable subcontractor, who failed

---

[212] *Id.* at 3.
[213] Compl. ¶ 44; Pl. Aff.; Gibellino Dep. at 20: 1-7.
[214] *Id.*
[215] Ex. 1 to Contractor's Mot. Summ. J.; Mot. Summ. J. ¶ 10.
[216] *See* Gibellino Dep. at 34: 4-8.
[217] Compl. ¶¶ 11-12, 39-46.
[218] Compl. ¶ 40.

to protect Plaintiff's personal property during the commission of the contracted work."[219] Plaintiff further alleges that Contractor breached the Restoration Contract "via a subcontractor that he chose who was acting on his behalf, [who] damaged Plaintiff's property."[220]

## C. ANALYSIS

Superior Court Civil Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case."[221] To succeed on a breach of contract claim, a plaintiff must establish the following three elements: "(1) the existence of a contract, whether express or implied; (2) breach of one or more of the contract's obligations; and (3) damages resulting from the breach."[222]

With respect to the first element, there was an express contract between Contractor and Plaintiff in the form of the Restoration Contract, which plaintiff attached as Exhibit A to her complaint.[223] With respect to the second element, Plaintiff essentially alleges that Contractor breached the Restoration Contract by

---

[219] Compl. ¶ 41.
[220] Compl. ¶ 42.
[221] *Burkhart v. Davies,* 602 A.2d 56, 59 (Del. 1991).
[222] *GEICO Gen. Ins. Co. v. Green,* 276 A.3d 462 (TABLE), 2022 WL 1052195, at *5 (Del. 2022). The Court has set forth the summary judgment standard of review above and does not repeat it in this section in its entirety.
[223] Transaction ID 66605515. The Court notes that Plaintiff attached the Moving Contract as a separate exhibit to her complaint: Exhibit B: "Subcontractor Contract."

hiring Subcontractor and negotiating the terms of the Moving Contract, to the exclusion of Plaintiff.[224] From Plaintiff's allegations in the complaint and in her response to this motion, the Court infers that Plaintiff is alleging Contractor breached the Content Packout Provision.[225]

### 1. Alleged damage to Plaintiff's property does not amount to a breach of the Restoration Contract.

The overarching question presented by this motion is whether the Court can decide as a matter of law that Contractor did not breach the Restoration Contract. The determination of this question depends on the disposition of the following questions: (1) does the alleged damage to Plaintiff's property, proximately caused by Subcontractor, constitute a breach of the Content Packout Provision by Contractor; and (2) does the fact that the valuation amount ($20,000) in the Moving Contract was preselected constitute a breach of the Restoration Contract?

As to the first question, the Content Packout Provision shows that Contractor took on the responsibility of identifying a Subcontractor to move and store Plaintiff's household furnishings and obtaining a quote from Subcontractor to include in the

---

[224] Compl. ¶¶ 41-42, 46 ("Contractor breached the Contractor Contract [Restoration Contract] when Contractor used an unqualified, unskilled, and otherwise unsuitable subcontractor, who failed to protect Plaintiff's personal property during the commission of the contracted work. Contractor breached the Contractor Contract [Restoration Contract] when Contractor, via a subcontractor that he chose who was acting on his behalf, damaged Plaintiff's property.") *Id.* ¶ 41-42.

[225] Restoration Contract at 3.

total insurance claim.[226]   The Restoration Contract is the only contract between Plaintiff and Contractor that has been submitted to the Court and is silent on the issue of indemnification or assumption of liability.   Plaintiff has not submitted any supporting documentation that raises a genuine issue of material fact that Contractor had any further obligations with regard to moving and storing her belongings, let alone that Contractor breached these obligations.

Nothing in the Restoration Contract indicates Contractor had any obligation or involvement in the execution or oversight of Subcontractor's services.   Plaintiff does not allege that Contractor was present during the moving and transportation of her belongings, let alone controlled or supervised Subcontractor's work.[227]   The parties have not provided any contract or agreement between Plaintiff's insurance company and Contractor or between Contractor and Subcontractor.   Because there is no genuine issue of material fact that Contractor did not breach the Content Packout provision in the Restoration Contract, the Court finds as a matter of law that damage proximately caused by Subcontractor does not constitute a breach of the Restoration Contract by Contractor.

---

[226] *Id.*; *see also* Gibellino Dep. at 12-14, 17 (testifying that he or Contractor's project manager are responsible for obtaining quotes from subcontractors, that Contractor tends to use Subcontractor when a client's personal belongings need to be moved into storage, and that Contractor coordinated with Subcontractor to estimate the cost of moving and storage.).

[227] *See* Gibellino Dep. at 23: 5-10 (Q: "Was anyone from Gibellino Construction at the pack out when it happened?" A: "I can't remember. I don't – I never was there. I can't say if Drew McMullen [Contractor's project manager] was there."). *Id.*

## 2. Contractor's alleged involvement in preselecting a coverage amount in the Moving Contract does not amount to a breach of the Restoration Contract.

As to the second question, the Court has already found in the adjudication of the cross motions for summary judgment that the Valuation Provision is valid and enforceable. The fact that Contractor may have required this minimum coverage in the Moving Contract does not constitute a breach of the Restoration Contract for similar reasons. As an initial matter, the testimony conflicts as to whether Contractor required or was even aware that Subcontractor preselected the amount of coverage in the Moving contract. Gibellino testified that he was not aware of the coverage amount chosen by Subcontractor.[228] Hopkins and Sterling testified that Contractor and Subcontractor agreed that Subcontractor would provide a minimum coverage amount of $20,000 for all jobs involving Contractor.[229]

Even if Contractor did require a minimum coverage amount, as the Court has explained above, this Provision was negotiable, not compulsory. Plaintiff has provided no caselaw supporting her assertion that a contractor's arrangement of a minimum negotiable coverage amount in a subcontractor's contract is a breach of

---

[228] Gibellino Dep. at 22: 4-12; 35: 20-24; 36: 1-2 ("I don't know if that's their lowest value option. That's – I've never looked at the – the insurance value of the quote. That's typically - they discuss that with the customer when they do the move, I believe." . . . Q: "Is the amount of coverage changed typically per customer or is it the same for everyone, if you know?" A: "I don't know." Q: "Is that something you typically look at?" A: "No."). *Id.* Gibellino also testified to his understanding that the moving Contract is reviewed with the customer when Subcontractor meets with the customer at the beginning or start of the move. *Id.* at 38: 7-12.

[229] *See supra* n. 11.

the Contractor's contract. Contractor has established that there is no genuine issue of material fact as to whether the preselected valuation amount constitutes a breach of the Restoration Contract. For Plaintiff's breach of contract claim to survive the summary judgment stage, she was thus required to raise a genuine issue of material fact as to whether Contractor breached the Restoration Contract and she has not. Because Plaintiff has not established an essential element of her claim, Contractor is entitled to judgment as a matter of law.

## VI.   CONCLUSION

For the reasons expressed herein, the Court finds that there is no genuine issue of material fact that Contractor did not breach the Restoration Contract either by hiring Subcontractor or requiring a minimum amount of coverage, and that Contractor is entitled to judgment as a matter of law. Contractor's motion for summary judgment is therefore GRANTED. As stated above, Subcontractor's motion for partial summary judgment is GRANTED and Plaintiff's cross motion for partial summary judgment is DENIED.

**IT IS SO ORDERED.**